

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CHARLES PEIFFER, | ) | |
| | ) | No. 34715-0-III |
| Respondent/Cross Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PRO-CUT CONCRETE CUTTING | ) | PUBLISHED OPINION |
| AND BREAKING INC. (UBI No. | ) | |
| 602427891); and KELLY R. SILVERS | ) | |
| and ERIN SILVERS, husband and wife | ) | |
| and the marital community comprised | ) | |
| thereof; | ) | |
| | ) | |
| Appellants/Cross Respondents, | ) | |
| | ) | |
| MONTE SAINSBURY and SHELLY | ) | |
| SAINSBURY, and the marital community | ) | |
| comprised thereof, | ) | |
| | ) | |
| Defendants. | ) | |

SIDDOWAY, J. — An employer appeals and its employee cross appeals errors that allegedly occurred in the bench trial of the employee's claim for unpaid wages and constructive discharge in violation of public policy. Each prevails in part.

No. 34715-0-III
*Peiffer v. Pro-Cut Concrete, et al.*

We affirm the trial court's rulings that the statute of limitations for Charles Peiffer's wage claim was tolled during the period his wage complaint was under investigation by the Department of Labor and Industries, and that Mr. Peiffer was entitled to an award of his reasonable attorney fees and costs.

We reverse the trial court's dismissal of Mr. Peiffer's claim for constructive wrongful termination in violation of public policy, reverse its award of an amount to compensate Mr. Peiffer for an increased tax liability, reverse its finding that Mr. Peiffer knowingly submitted to withholding of his wages, and reverse and remand the inadequately-explained attorney fee and cost award.

We remand for a new trial on the constructive wrongful termination claim, for reconsideration of the award of reasonable attorney fees and costs and the entry of sufficient findings, and with directions to enter a supplemental judgment that will afford Mr. Peiffer double damages for his wage claim less the $8,784 tax-related amount that was awarded in error.

FACTS AND PROCEDURAL BACKGROUND

Charles Peiffer worked at Pro-Cut Concrete Cutting and Breaking, Inc. intermittently over a period of 23 years. He began working at Pro-Cut in 1989 when he was 16, soon leaving its employ to attend trade school and participate in a Job Corps program. He resumed working at Pro-Cut when he was 18 or 19 and over time was trained as a slab saw operator. He left Pro-Cut's employ for another job but returned in

2

2005, at Pro-Cut's invitation. By the time of his return in 2005, Kelly Silvers and his wife had purchased the company.

As a slab saw operator, Mr. Peiffer was required to pick up a company vehicle at Pro-Cut's business location, which he would then drive to his assigned job site. Pursuant to a written travel policy, Pro-Cut's employees were not paid for the first 30 minutes or last 30 minutes of drive time between Pro-Cut's shop and a job site, the company's reasoning being that it could not charge the customer for that time. The policy predated the Silvers' ownership and was in place the entire time Peiffer worked at Pro-Cut.

Mr. Peiffer submitted a time card each week for his hours worked. In 2008, Mr. Peiffer noticed that his time cards, which were reviewed by his supervisor, Monte Sainsbury, were being altered. Times recorded by Mr. Peiffer were sometimes "whited out" and new times were written in. Report of Proceedings (RP) at 213. It turned out that when Mr. Sainsbury believed employees had inflated their work time, he would alter their time cards to reflect what he believed was accurate time, including to remove time entered for the first and last half-hour of travel. Mr. Silvers was aware of Mr. Sainsbury's action in changing time cards.

Mr. Peiffer objected to Mr. Sainsbury's alteration of his time cards. On one occasion, his objection led to a physical altercation between the two men. Mr. Peiffer was told that if he did not like the policy, he could quit.

3

Ultimately, Mr. Peiffer did quit. It was on June 8, 2012, after Mr. Sainsbury had again altered Mr. Peiffer's time card. Mr. Peiffer later testified that when he saw how many lines of his time card were whited out "that was it." RP at 221. He refused to return to work unless Pro-Cut paid him the full wages owed him. Mr. Peiffer's last paycheck was in an amount that reflected a reduction of roughly 10 of the hours he had reported. At his prevailing wage at $28.78, that amounted to approximately $300 of withheld wages for the week.

On July 3, 2012, Mr. Peiffer filed a wage complaint with the Department of Labor and Industries, which immediately opened an investigation. The Department's investigation remained open for 14 months during which it never issued a citation or notice of assessment and no administrative action was begun. According to Anna Sanchez, the department investigator assigned to Mr. Peiffer's claim, she was able to determine that "there were clearly some wage violations" but his claim was "extremely difficult." RP at 176-77. Mr. Peiffer submitted records of invoices, time cards, and pay stubs to the Department, but he acknowledges that the records he provided were incomplete.

Ms. Sanchez was aware that statutes under which the Department operates contemplate that an investigation will be completed in 60 days. By statute, the Department is required to provide advance written notice if it has good cause for taking longer to complete its investigation, and is required to specify the duration of the

4

extension. During the 14 months the Department's investigation was pending, Ms. Sanchez sent a number of "60-day letters" to Mr. Peiffer, indicating that his claim required more time to investigate. RP at 175, 178. She did not send copies of the 60-day letters to Pro-Cut.

When questioned in the trial below, Ms. Sanchez explained that she was the only investigator for Benton, Franklin, Columbia, Walla Walla, and Spokane Counties and given her caseload and the volume of records delivered by Mr. Peiffer, it was difficult to create a calculation of Mr. Peiffer's unpaid wages. She told him several times during the months the investigation was pending that *he* needed to provide a calculation of his unpaid wages. He responded several times that he had no calculation, and would go along with whatever the Department calculated his unpaid wages to be.

Having reached this impasse, and having waited well over a year for department action on his claim, Mr. Peiffer retained a lawyer, Alicia Berry. She filed suit on his behalf against Pro-Cut, Mr. Silvers, Mr. Sainsbury and the men's wives and marital communities on November 22, 2013. The complaint included nine causes of action. Among them were several causes of action seeking unpaid wages and prejudgment interest. The complaint also included a claim for constructive wrongful termination in violation of public policy. Mr. Peiffer alleged he had been unable to obtain work that paid as well as his former work as a slab saw operator, and he sought to recover back pay and front pay.

5

Upon learning of Mr. Peiffer's lawsuit from Ms. Berry a few days after it was filed, Ms. Sanchez wrote what she described as a "closure letter" to Mr. Peiffer dated November 27, 2013. Although the letter is not in our record on appeal, she evidently stated that in light of his lawsuit she was terminating her investigation.

The lawsuit filed by Ms. Berry put Pro-Cut on notice for the first time that Mr. Peiffer had filed a wage complaint with the Department.

After suit was filed, the jointly-represented defendants delivered a series of what their lawyer described as "stipulation[s] as to the amount owing" in an effort to avoid liability for Mr. Peiffer's reasonable attorney fees under RCW 49.48.030.[1] Clerk's Papers (CP) at 46. In the final stipulation the defendants filed before trial, they admitted to wages owed of $31,631.69. As explained by the defendants' lawyer, this was based on a letter from Ms. Berry dated May 3, 2016, that provided her calculation of the wages owed, although the defendants then adjusted Ms. Berry's calculation downward. Ms. Berry's calculation included unpaid wages owed beginning in June 2009, based on Mr.

---

[1] The statute provides:

In any action in which any person is successful in recovering judgment for wages or salary owed to him or her, reasonable attorney's fees, in an amount to be determined by the court, shall be assessed against said employer or former employer: PROVIDED, HOWEVER, That this section shall not apply if the amount of recovery is less than or equal to the amount admitted by the employer to be owing for said wages or salary.

Peiffer's position that the statute of limitations on his wage claim was tolled during the Department's investigation. The defendants reduced Ms. Berry's calculation based on their position that the statute of limitations was not tolled. They limited the amount of their admitted liability to unpaid wages owed beginning in November 2010.

The lawsuit proceeded to a bench trial. In addition to presenting evidence of the amount of unpaid wages, prejudgment interest, and reduced earnings, Mr. Peiffer presented evidence that he and his wife would pay additional federal income tax as a result of receiving his unpaid wages in a lump sum. The defendants presented no evidence on the tax issue.

After Mr. Peiffer rested his case, the defendants moved the court for involuntary dismissal of a number of his claims under CR 41(b)(3). The trial court did not rule on the motion immediately, wanting to receive responsive briefing. When the motion was brought up the next day, the trial court stated that it would address the CR 41(b)(3) motion in closing and was "going to make [its] ruling all in one." RP at 262.

At the conclusion of the bench trial, the court dismissed the claims against the Sainsburys and otherwise ruled as follows:

- It determined that by filing a claim with the Department, the statute of limitations on Mr. Peiffer's claim was tolled and it awarded Mr. Peiffer withheld wages in the amount of $42,768.12;

- It awarded Mr. Peiffer prejudgment interest of $28,491.40;

- It awarded Mr. Peiffer the amount of $8,784.00 to offset his increased tax liability on account of receiving his unpaid wages in a lump sum;

- It determined that Pro-Cut and the Silvers had been willful in withholding wages but that Mr. Peiffer knowingly submitted to the withholding, so it denied Mr. Peiffer's request for an award of double damages under RCW 49.52.070;

- It found that Mr. Peiffer was entitled to an award of his reasonable attorney fees and costs under RCW 49.48.030, having recovered more in wages than Pro-Cut had admitted was due; and

- It granted the defendants' CR 41(b)(3) motion for dismissal of Mr. Peiffer's claims for breach of contract, violation of the Consumer Protection Act, chapter 19.86 RCW, and constructive wrongful termination.

The amount of reasonable attorney fees and costs to be awarded Mr. Peiffer was argued thereafter. Ms. Berry and her co-counsel, Brian Davis, submitted a declaration and affidavit, respectively, with attached time records, documenting a lodestar fee measure of $73,395.50. They had represented Mr. Peiffer under a contingent fee agreement and sought a multiplier based on risk associated with taking the case.

Mr. Peiffer sought $9,778.82 in costs, some of which were for reimbursement of Ms. Berry's costs of traveling to Washington State for the trial. After taking the case while resident in Washington, Ms. Berry and her family moved to the east coast. While she associated Mr. Davis to handle pretrial court appearances, she traveled to Washington State for trial, including on one occasion when the case was set for trial but was bumped by other cases.

Although the court made three findings that courts sometimes view as supporting a multiplier, the trial court awarded attorney fees to Mr. Peiffer in the rounded amount of $50,000.00 without an explanation for the reduction from the lodestar figure other than that $50,000.00 was "a reasonable amount." RP at 314. In its written findings, the court described its award as the "reasonable and necessary" amount. CP at 127. It awarded $5,503.13 in costs. The cost amount was also unexplained, although it is pointed out on appeal that the amount can be arrived at by subtracting Ms. Berry's travel costs from Mr. Peiffer's requested costs.

Pro-Cut appeals. Mr. Peiffer cross appeals.

ANALYSIS

Appeal

Pro-Cut[2] makes three assignments of error on appeal. It contends the trial court erred (1) in determining that Mr. Peiffer's wage claim was tolled during the Department's investigation, (2) in awarding Mr. Peiffer attorney fees and costs, and (3) in awarding damages to compensate for an increased tax liability. We address the claimed errors in the order stated.

I.      THE STATUTE OF LIMITATIONS FOR CIVIL ACTIONS IS TOLLED DURING A
        DEPARTMENT INVESTIGATION WHETHER THE EMPLOYEE RESOLVES A CLAIM
        ADMINISTRATIVELY OR THROUGH A CIVIL ACTION

---

[2] Judgment was entered jointly and severally against Pro-Cut and the Silvers and all of them appeal. For simplicity we refer to them collectively as "Pro-Cut."

The parties agree that the statute of limitations applicable to Mr. Peiffer's wage claims is three years. RCW 4.16.080(3) (applicable to actions on implied contracts); *Seattle Prof'l Eng'g Emps. Ass'n v. Boeing Co.*, 139 Wn.2d 824, 837-38, 991 P.2d 1126 (2000). Pro-Cut contends the trial court erred when it ruled that the statute of limitations was tolled when Mr. Peiffer filed his wage complaint with the Department and awarded Mr. Peiffer unpaid wages going back to July 3, 2009.

Washington law provides that the Department "shall investigate" a wage complaint filed with the Department. RCW 49.48.083(1). It "shall issue either a citation and notice of assessment or a determination of compliance" unless the wage complaint is "otherwise resolved." *Id.* If the Department finds a violation, it issues a citation and notice of assessment that is served on the employer and employee. *Id.* An employer aggrieved by a citation and notice of assessment has 30 days within which to file a notice of appeal with the department director, failing which the citation and notice of assessment become final and binding. RCW 49.48.084(1).

Having issued the citation and notice of assessment, the Department may order the employer to pay the complaining employee all wages owed for the three years preceding the filing of the wage complaint, including interest of one percent per month on the wages owed. RCW 49.48.083(2). Payment by the employer and acceptance by the employee of the wages and interest assessed by the Department bars the employee from

10

initiating and pursuing any court action based on the wage payment requirements addressed in the citation and notice of assessment. RCW 49.48.083(4).

A wage complainant who receives his or her copy of a citation and notice of assessment served by the Department on the employer is permitted by RCW 49.48.085(1) to terminate the Department's administrative action by providing written notice to the Department within 10 business days. The statute goes on to provide in its subsection (3)(a) that "[n]othing in this section shall be construed to limit or affect . . . [t]he right of any employee to pursue any judicial, administrative, or other action available with respect to an employer."

Zeroing in on the statutory language on which the tolling issue turns, RCW 49.48.083(5) provides,

> The applicable statute of limitations for civil actions is tolled during the department's investigation of an employee's wage complaint against an employer.

It then more particularly identifies the beginning and end of the tolling period, as follows:

> For the purposes of this subsection, the department's investigation *begins* on the date the employee files the wage complaint with the department and *ends* when: (a) The wage complaint is finally determined through a final and binding citation and notice of assessment or determination of compliance; or (b) the department notifies the employer and the employee in writing that the wage complaint has been otherwise resolved or that the employee has elected to terminate the department's administrative action under RCW 49.48.085.

11

*Id.* (emphasis added).

Application of this provision presents a question of statutory interpretation that we review de novo. *State v. Bradshaw*, 152 Wn.2d 528, 531, 98 P.3d 1190 (2004). We begin by looking at the plain meaning of the statute as expressed through the words themselves. *Tesoro Ref. & Mktg. Co. v. Dep't of Revenue*, 164 Wn.2d 310, 317, 190 P.3d 28 (2008). Where the meaning of the statute is plain and unambiguous, we give effect to that plain meaning. *Overlake Hosp. Ass'n v. Dep't of Health*, 170 Wn.2d 43, 52, 239 P.3d 1095 (2010). Only if the language is ambiguous do we look to aids of statutory construction, such as legislative history. *State v. Armendariz*, 160 Wn.2d 106, 110-11, 156 P.3d 201 (2007).

Ms. Sanchez's testimony in the trial below established that the Department had an open investigation of Mr. Peiffer's wage complaint against Pro-Cut from July 3, 2012, until she terminated the investigation on November 27, 2013. Applying the plain meaning of the first sentence of RCW 49.48.083(5), the applicable statute of limitations for civil actions was tolled during that time. Pro-Cut argues that the more particular identification of the beginning and end dates of the tolling period leads to a different result, however.

The parties agree that the Department's investigation began on July 3, 2012. They agree that the subparagraph (a) end date of the tolling period does not apply, because Mr.

Peiffer's wage complaint was never finally determined through a final and binding citation and notice of assessment or determination of compliance.

They agree that one of the subparagraph (b) end dates—"that the employee has elected to terminate the Department's administrative action under RCW 49.48.085"— does not apply, because the 10-day postcitation right to terminate the Department's investigation never arose and could never have been exercised by Mr. Peiffer.

That leaves the parties with three theories of how RCW 48.49.083(5) applies on these facts. Mr. Peiffer advances two arguments. One is that the remaining subparagraph (b) end date applies because Ms. Sanchez's November 27 closing letter "notifie[d] the employer and the employee in writing that the wage complaint has been otherwise resolved." There are two problems with this argument. One is that the wage complaint had not been "resolved" in the commonly-understood meaning of that word.[3] The second is that the Department did not notify "*the employer* and employee in writing," since its closing letter was sent only to Mr. Peiffer.

Mr. Peiffer's second argument is that according to the plain language of RCW 49.48.083(5), nothing happened to make the tolling period end, meaning that tolling

---

[3] Relevant definitions of "resolve" include "**5** . . . **c :** to find an answer to **:** make clear or certain **:** SOLVE, UNRIDDLE (~ a problem) **6 a :** to bring oneself or another to (as a course of action) **:** DECIDE <having *resolved* his fate> . . . **b :** to reach a decision about **:** SETTLE <determined to ~ all disputed points>." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1933 (1993).

applies.  Pro-Cut agrees that under the plain language of the provision nothing happened

to make the tolling period end.  But it argues,

> [T]he question becomes, what did the legislature intend if the "end" of the
> tolling period is never triggered?
>      In its wisdom, the legislature designed the specificities of the tolling
> statute with the purpose of encouraging employees to see the Department's
> investigation through to the end.  Otherwise, employees could simply
> initiate the Department's investigation, fail to meaningfully assist in the
> investigation, thereby artificially tolling the statute of limitations
> indefinitely.  This result encourages employees to abuse the resources of
> the Department to their own strategic advantage, and deprives employers of
> the finality of a Department decision they can act upon to remedy their
> mistake.

Appellants/Cross-Resp't's Opening Br. at 12.  "[B]ecause he did not allow the

Department to reach a conclusion," Pro-Cut contends, "Mr. Peiffer cannot . . . take

advantage of the tolling of the statute of limitations."  *Id.* at 13.  Unfortunately for Pro-

Cut, statutory language does not support its theory about the legislature's intent.

We begin with Pro-Cut's textual arguments.  Its primary reliance is on RCW

49.48.085(1), which states:

> An employee who has filed a wage complaint with the department may
> elect to terminate the department's administrative action, thereby
> preserving any private right of action, by providing written notice to the
> department within ten business days after the employee's receipt of the
> department's citation and notice of assessment.

Pro-Cut sometimes treats the language "thereby preserving *any private right of action*" as

if it said "thereby preserving *the benefit of tolling*," which is plainly not what it says.  The

provision does not speak to tolling at all.

14

Pro-Cut treats the language about electing to "terminate the *department's*

*administrative action*" as if it said "terminate the *employee's exclusive reliance on an*

*administrative remedy*," but here again, that is plainly not what is said. RCW

49.48.085(1) identifies the only circumstance in chapter 49.48 RCW under which an

employee can stop an investigation that the Department is otherwise obliged to pursue.[4]

It says nothing about whether an employee can bring a civil action and allow the

department investigation to proceed. Even a federal case cited by Pro-Cut, *Jama v. GCA*

*Services Group, Inc.*, finds no statutory prohibition against administrative action and

litigation proceeding simultaneously. No. C16-0331RSL, 2017 WL 4758722 (W. D.

Wash. Oct. 20, 2017) (court order). *Jama* involved a proposed class action, in which the

defendant-employer argued that including employees who had filed wage complaints

with the Department as members would deprive those employees of the administrative

forum. The court disagreed:

> No legal analysis is offered in support of this assertion. State law
> authorizes employees to file a wage complaint with Labor & Industries
> [DLI] regarding any wage violations that occurred within the past three
> years. RCW 49.48.083(1). The filing of an administrative complaint tolls
> the statute of limitation and, if DLI assesses wages and interest against the
> employer and the employee accepts payment, the employee is barred from

---

[4] Before 2006, the Department could, but was not required to, investigate wage
complaints. With the 2006 adoption of the Wage Payment Act, the Department is
required to investigate such complaints. The history of the requirement is discussed in
Washington Attorney General Opinion No. 6 (2010). 2010 Op. Att'y Gen. No. 6,
https://www.atg.wa.gov/print/3194 [https://perma.cc/9MNS-6B3H].

pursuing relief in court for that violation. RCW 49.48.083(4) and (5). *The Court has not found, and defendants have not identified, any provision that would automatically terminate a pending administrative investigation upon the filing of a lawsuit.* Although the statute specifically authorizes employees who have filed wage complaints with the DLI to terminate the administrative action in order to pursue litigation, it expressly states that the "right of any employee to pursue any judicial administrative, or other action available with respect to an employer" is not limited or affected. RCW 49.48.085(1) and (3).

*Id*. at *5 (emphasis added). The Department might have the ability to suspend work on a file upon learning that a wage complainant is pursuing private litigation, but we find no statutory basis for the Department to terminate its investigation because litigation has been filed.[5]

Pro-Cut's final textual argument refers us to legislative history from 2006, and a drafting change between original language in House Bill 3185 and revised language in Substitute House Bill 3185 that was later codified as RCW 49.48.085(1). Pro-Cut relies on the ultimately codified language that the employee may elect to terminate the Department's investigation by providing notice "*within ten business days after*" receipt of the citation and notice of assessment—language that originally read "*within five business days of*" receipt of the citation and notice of assessment. *Compare* SUBSTITUTE H.B. 3185, § 4, at 5, 59th Leg., Reg. Sess. (Wash. 2006), *with* H.B. 3185, § 4, at 4, 59th Leg.,

---

[5] We say "might" because the Department's duty or authority when litigation is filed while an investigation is pending has not been briefed and argued by the parties.

Reg. Sess. (Wash. 2006). Pro-Cut contends that use of the word "after" "ensure[s]" that the Department must complete its investigation for the tolling provision to apply. Appellants/Cross-Resp't's Opening Br. at 14. But nowhere in RCW 49.48.085 is there any reference to "toll," "tolling," or even to "RCW 49.48.083." The language on which Pro-Cut relies simply has nothing to do with tolling.[6]

We turn to Pro-Cut's non-textual argument that the legislature's objective was to "encourage[ ] employees to see the Department's investigation through to the end"—an objective it argues is advanced by making tolling available to only those employees who wait for the Department to complete its investigation before electing to file a lawsuit. Pro-Cut argues that employees who do not wait "abuse the resources of the Department." Appellants/Cross-Resp't's Opening Br. at at 12.

Such employees "use" resources of the Department, but Pro-Cut does not explain how they "abuse" them. The legislature has charged the Department with investigating

---

[6] Pro-Cut overlooks reasons why the Department's issuance of a citation is a valid point at which to require employees to decide whether to stop the Department's investigation. At that point, the employee will know the amount of unpaid wages the Department is willing to fight for. With the citation and notice of assessment, things will start happening quickly. An employer who realizes there has been a violation might want to pay within 10 days to be entitled to a penalty waiver and avoid additional prejudgment interest. *See* RCW 49.48.083(2), (3)(c). Within 30 days, the employer will need to file any appeal, and in the event of an appeal, the hearing will be assigned to an administrative law judge, an initial order will issue, and an assistant attorney general will need to be appointed to represent the Department. RCW 49.48.084(1), (3). These things would, or could, prove pointless if the employee wishes to litigate.

wage complaints. The objective is to assist employees whose wages have not been paid by an employer. If a wage complainant decides during a department investigation that retaining a lawyer and pursuing a claim in court will be faster or more likely to succeed, the decision both advances the interest of the employee and frees up department resources to assist others. Pro-Cut's vision of a legislature that intends the Department to maintain a jealous grip on complaints it cannot timely resolve is unpersuasive.

We also reject Pro-Cut's argument that permitting an employee to file a wage complaint with the Department and then shift to litigation "artificially" tolls the statute of limitations "indefinitely," to the employee's own "strategic advantage." *Id.* The tolling will not be indefinite. It will not even be protracted if the Department completes its investigation within the 60 days contemplated by the legislature. And we do not view the employee as gaining a "strategic advantage" if tolling locks in the employee's ability to collect all wages earned but unpaid during the prior three years. Going on record with a formal claim in a proper forum is a *typical* way to lock in the ability to collect damages that accrued during a limitations period.

Our only agreement with Pro-Cut on this issue is that it was disadvantaged by being unaware of Mr. Peiffer's wage complaint earlier. Upon learning of the wage complaint, Pro-Cut quickly realized that it should admit the amount of wages owed in order to avoid liability for attorney fees. But the lack of notice to Pro-Cut was the fault of the Department, not Mr. Peiffer. Pro-Cut should have received the first 60-day letter

18

that Ms. Sanchez sent to Mr. Peiffer, whether or not she had communicated with Pro-Cut earlier. RCW 49.48.083(1) provides that if the Department is unable to complete its investigation within 60 days of receiving a wage complaint, it "may extend the time period by providing advance written notice to the employee *and the employer* setting forth good cause for an extension of the time period and specifying the duration of the extension." (Emphasis added.)

We are not at all sympathetic to Pro-Cut's complaint that it incurred the cost of additional prejudgment interest because of the time it took Ms. Berry to deliver a final calculation of Mr. Peiffer's wages. The difficulty in accounting for the unpaid wages was entirely attributable to Pro-Cut's practice of altering time cards and failing to keep a record of the amount of time originally reported by the employee.[7] The duty to keep accurate time records is the employer's, not the employee's. WAC 296-128-010. If Pro-Cut wanted a quicker calculation, it could have engaged in any needed discovery and worked on preparing one itself.

If an employee files a wage complaint with the Department and then files a civil action while the investigation is pending, RCW 49.48.083(5), reasonably construed, tolls

---

[7] Because Pro-Cut stipulated to Mr. Peiffer's final wage calculation, no evidence was presented at trial about the challenges in preparing the calculation. Arguments of counsel during the bench trial referred to the difficulty of calculating the wage amount and the extensive document discovery required. *See, e.g.*, RP at 96-98. It is clear that information in both sides' possession was ultimately required to arrive at a calculation.

the statute of limitations until the Department resolves the complaint or the civil action is

completed, at which point the Department can send notice that the matter has been

"otherwise resolved." The trial court correctly ruled that the tolling provision applied to

Mr. Peiffer.

II.     HAVING DETERMINED THAT THE STATUTE OF LIMITATIONS WAS TOLLED, MR.
        PEIFFER WAS ENTITLED TO AN AWARD OF REASONABLE ATTORNEY FEES AND
        COSTS

Washington statutes authorize trial courts to award attorney fees to successful

wage claimants, but RCW 49.48.030 takes that authority away "if the amount of recovery

is less than or equal to the amount admitted by the employer to be owing for said wages

or salary." Pro-Cut's assignment of error to the attorney fees and costs awarded to Mr.

Peiffer depended on successfully arguing that his claim was not tolled during the

Department's investigation, in which case his recovery would have been equal to the

amount Pro-Cut admitted was owing.

Because the statute *was* tolled, Mr. Peiffer was entitled to recovery of unpaid

wages going back to July 2009, an amount that exceeded the amount admitted by Pro-Cut

to be owing. There was no error in concluding that Mr. Peiffer was entitled to recover

reasonable attorney fees and costs.

III.    THE TRIAL COURT ERRED IN CONCLUDING THAT MR. PEIFFER WAS ENTITLED TO
        RECOVER AN AMOUNT EQUAL TO HIS INCREASED TAX LIABILITY ARISING FROM THE
        LUMP SUM PAYMENT OF HIS PREVIOUSLY UNPAID WAGES

No. 34715-0-III
*Peiffer v. Pro-Cut Concrete, et al.*

Pro-Cut argues the trial court erred in awarding Mr. Peiffer $8,784 to offset tax consequences because the trial court had no statutory authority to make the award. We agree.

In *Blaney v. International Ass'n of Machinists & Aerospace Workers, District No. 160*, 151 Wn.2d 203, 87 P.3d 757 (2004), our Supreme Court held that in an action for discrimination under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, a successful plaintiff can recover an amount offsetting the federal income tax consequences of a damage award. It based its decision on language unique to the WLAD.

RCW 49.60.030(2) provides that a person injured by a violation of the WLAD shall have a civil action

> to enjoin further violations, or to recover the actual damages sustained by the person, or both, together with the cost of suit including reasonable attorneys' fees *or any other appropriate remedy authorized by this chapter or the United States Civil Rights Act of 1964 as amended, or the Federal Fair Housing Amendments Act of 1988 (42 U.S.C. Sec. 3601 et seq.).*

(Emphasis added.)

In *Blaney*, the court construed the "any other appropriate remedy" clause as standing on its own as a remedy provision—different from, and additional to injunctive relief, actual damages, and costs of suit. 151 Wn.2d at 214. It observed that "a number of federal courts" in Title VII suits had used the equitable powers bestowed on them by Title VII to allow offsets for the federal tax consequences of damage awards. *Id.* at 215.

21

For that reason, and "[b]ecause WLAD incorporates remedies authorized by the federal civil rights act," it concluded that "WLAD allows offsets for additional federal income tax consequences." *Id.* at 215-16.

The court did not end its analysis with the holding that the offset was permitted by WLAD's "any other appropriate remedy" clause. It went on to hold that the offset was not allowable as actual damages or as a cost. It refused to characterize an offset for federal income tax consequences as actual damages "because the proximate cause of the additional tax consequences is not the unlawful discrimination, but rather the additional tax liability is a direct result of the tax laws." *Id.* at 216. "[It] is too attenuated from the unlawful discrimination to be deemed actual damages." *Id.*

It refused to characterize an offset for the tax liability as a cost of suit "because tax liability is incurred after, not during, litigation." *Id.* at 217.

*Blaney* is controlling authority that an offset for tax consequences is not actual damages or a cost. Mr. Peiffer argues, however, that the term "wages" in Title 49 RCW is broadly interpreted to effectuate the legislature's purpose of deterring employers from withholding wages and has been construed to include back pay, front pay, sick leave reimbursement, vacation pay, and commissions. Br. of Resp't/Cross Appellants at 21 (citing *Lietz v. Hansen Law Offices, PSC*, 166 Wn. App. 571, 595, 271 P.3d 899 (2012)). He urges us to decide as a matter of first impression that "wages," broadly construed, can include an offset for adverse tax consequences.

22

Pay for work (back and front), sick leave reimbursement, vacation pay, and commissions all fall within the commonly understood meaning of "wage," which has been defined to mean

> **1 a :** a pledge or payment of usu. monetary remuneration by an employer esp. for labor or services usu. according to contract and on an hourly, daily, or piecework basis and often including bonuses, commissions, and amounts paid by the employer for insurance, pension, hospitalization, and other benefits.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2568 (1993); *see also* RCW 49.46.010(7) (defining "wage" in relevant part as "compensation due to an employee by reason of employment"). The increased tax liability that Mr. Peiffer incurred as a result of recovering his unpaid wages as a lump sum has none of the salient characteristics of a wage. The trial court erred in making an award of $8,784 to offset Mr. Peiffer's increased tax liability.

Cross Appeal

Mr. Peiffer makes four assignments of error in his cross appeal. He contends the trial court erred (1) in dismissing, as a matter of law, his claim for constructive wrongful termination in violation of public policy, (2) in denying his claim for double damages, (3) in denying Mr. Peiffer all of his attorney fees and failing to apply a multiplier, and (4) in denying Mr. Peiffer all of his costs. Again, we address the claimed errors in the order stated, combining our discussion of Mr. Peiffer's challenges to the fee and cost awards.

IV.     THE TRIAL COURT DISMISSED THE CONSTRUCTIVE WRONGFUL DISCHARGE CLAIM
        AS A MATTER OF LAW, WHICH WAS ERROR

        A.      THE CLAIM WAS DISMISSED AS A MATTER OF LAW

Under CR 41(b)(3), a defendant in a bench trial can move for involuntary dismissal after the plaintiff rests his or her case on the ground that "upon the facts and the law the plaintiff has shown no right to relief." The court "as trier of the facts" may then determine the facts and render judgment against the plaintiff, or may decline to render any judgment until the close of all the evidence. *Id.*

The trial court may grant a motion under CR 41(b)(3) as a matter of law or fact. *Roy v. Goerz*, 26 Wn. App. 807, 809, 614 P.2d 1308 (1980), *overruled on other grounds by Chaplin v. Sanders*, 100 Wn.2d 853, 859, 676 P.2d 431 (1984). When there is doubt as to how the trial court ruled, the reviewing court will look to the trial court's oral or written opinion. *N. Fiorito Co. v. State*, 69 Wn.2d 616, 620, 419 P.2d 586 (1966).

Although the basis on which Pro-Cut *moved* for the dismissal is not clear, there is no doubt that the trial court *granted it* as a matter of law. Its judgment reflects its understanding that Pro-Cut moved during trial for dismissal "as a matter of law," CP at 126, a motion that it granted. CP at 128. The court entered no findings of fact as provided in CR 52(a), which it was required to do if rendering judgment on the merits. CR 41(b)(3). Because the trial court dismissed the claim as a matter of law, "review is de novo and the question on appeal is whether the plaintiff presented a prima facie case,

24

viewing the evidence in the light most favorable to the plaintiff." *In re Dependency of Schermer*, 161 Wn.2d 927, 939-40, 169 P.3d 452 (2007).

B. MR. PEIFFER PRESENTED SUFFICIENT EVIDENCE TO REQUIRE A DECISION ON THE MERITS

"The tort for wrongful discharge in violation of public policy is a narrow exception to the at-will doctrine" that is recognized "as a means of encouraging employees to follow the law and preventing employers from using the at-will doctrine to subvert those efforts to promote public policy." *Becker v. Cmty. Health Sys., Inc.*, 184 Wn.2d 252, 258, 359 P.3d 746 (2015). In order to succeed on a claim for wrongful discharge in violation of public policy, a "plaintiff must plead and prove that his or her termination was motivated by reasons that contravene an important mandate of public policy." *Id.*

"A cause of action for wrongful discharge in violation of public policy may be based on 'either express or constructive' discharge." *Wahl v. Dash Point Family Dental Clinic, Inc.*, 144 Wn. App. 34, 43, 181 P.3d 864 (2008) (quoting *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 238, 35 P.3d 1158 (2001)). In appellate decisions reviewing claims for constructive wrongful termination in violation of public policy, courts commonly examine separately the elements of the tort and the elements of constructive discharge. *E.g., see id.* at 41-45.

The elements of a claim for wrongful termination in violation of public policy are that (1) the employee's discharge may have been motivated by reasons that contravene a clear mandate of public policy, and (2) the public-policy-linked conduct was a significant factor in the decision to discharge the worker. *Martin v. Gonzaga Univ.*, __ Wn.2d __ , 425 P.3d 837, 844 (2018). The first element encompasses clarity and jeopardy components. *Id.* at 843 (citing *Becker*, 184 Wn.2d at 258-59; *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 277-78, 287, 358 P.3d 1139 (2015)). If a claim does not fall within one of the four recognized categories of wrongful discharge in violation of public policy, the more refined Perritt[8] analysis may be required. *Id.* In determining the second factor, a burden-shifting procedure applies under which the employer may defeat the claim by proving that the termination was justified by an overriding consideration. *Id.* at 844.

The elements of a claim of constructive discharge are that (1) the employer deliberately made working conditions intolerable, (2) a reasonable person in the employee's position would be forced to resign, (3) the employee resigned because of the intolerable condition and not for any other reason, and (4) the employee suffered

---

[8] So-called because it was based on a treatise by Henry H. Perritt Jr., *Workplace Torts: Rights and Liabilities* (1991).

26

damages as a result of being forced to resign. *Barnett v. Sequim Valley Ranch, LLC*, 174 Wn. App. 475, 489, 302 P.3d 500 (2013).

When the hybrid claim is asserted, the elements of a constructive discharge claim supplant the second element of the wrongful termination in violation of a public policy claim.[9] The first element of the tort claim applies, although it is modified to address whether the intolerable condition that led the employee to resign contravened a clear mandate of public policy. All four elements of a constructive discharge claim apply.

Mr. Peiffer presented substantial evidence that the allegedly intolerable condition that led him to resign contravened a clear mandate of public policy. The four scenarios recognized as supporting a claim of wrongful discharge in violation of public policy are "'(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for

---

[9] In *Wahl*, the court analyzed whether the employer had an overriding justification for discharging the employee, even though the employee had proved that she quit (she was not fired) because of intolerable sexual harassment. The Washington Supreme Court's recent *Martin* decision holds that the after-acquired-evidence doctrine does not apply to wrongful discharge claims, meaning that an employer's overriding justification is irrelevant unless it motivated a firing. Since there *is* no firing in a constructive discharge case, we are satisfied that in such cases, it is unnecessary to analyze an overriding justification element.

reporting employer misconduct, i.e., whistle-blowing.'" *Martin*, 425 P.3d at 843

(quoting *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 936, 913 P.2d 377 (1996)).

The intolerable condition that led Mr. Peiffer to quit was Pro-Cut's continuing failure to

pay the full amount of wages he was owed, in contravention of his rights under chapters

49.48 and 49.52 RCW. Those laws "indicate[ ] a strong legislative intent to assure

payment to employees of wages they have earned." *Schilling v. Radio Holdings, Inc.*,

136 Wn.2d 152, 159, 961 P.2d 371 (1998).

Mr. Peiffer presented substantial evidence that Pro-Cut deliberately made working

conditions intolerable. The trial court made unchallenged findings that Mr. Peiffer

objected to the changing of his time cards on several occasions to both Mr. Sainsbury and

Mr. Silvers, and entered an unchallenged conclusion that Pro-Cut "willfully" withheld

$42,768.12 in wages owed to Mr. Peiffer. CP at 126. Mr. Peiffer presented evidence of

even more frequent objections that were "weekly to daily," and that were daily in the last

three months of his employment. RP at 220.

Mr. Peiffer presented substantial evidence from which a trier of fact could find

that a reasonable person in his position would have been forced to quit. Continuing

complaints got him nowhere. He testified that Pro-Cut's response was almost always,

"[I]f you don't like it you can quit." *Id*.

Mr. Peiffer's testimony was that the only reason he resigned his position at Pro-Cut was because of the time card alterations and wage withholding—sufficient evidence to establish the third element of his claim.

Finally, Mr. Peiffer presented evidence that he had difficulty finding work after resigning his position at Pro-Cut and that he made far less money in his employment at the time of trial than he had made as a slab saw operator for Pro-Cut. His wife testified that he had gone from making $40,000 to $50,000 a year to making $20,000 to $25,000 a year.

The evidence presented a prima facie case of constructive discharge in violation of public policy. It was error to dismiss the claim as a matter of law. Mr. Peiffer is entitled to a new trial.

V.     THE TRIAL COURT'S CONCLUSION OF LAW THAT "MR. PEIFFER KNOWINGLY SUBMITTED TO THE WITHHOLDING OF HIS WAGES" IS NOT SUPPORTED BY THE COURT'S FINDINGS OF FACT

One of the claims on which Mr. Peiffer prevailed was a claim for a wage withholding violation under RCW 49.52.050(2) (willfully paying a lower wage than obligated by contract). RCW 49.52.070 provides that any employer and any officer, vice principal or agent of an employer who violates RCW 49.52.050(1) or (2) shall be liable in a civil action for twice the amount of the wages unlawfully withheld, "PROVIDED, HOWEVER, That the benefits of this section shall not be available to any employee who has knowingly submitted to such violations."

The trial court entered the following unchallenged findings of fact relevant to the wage withholding violation claim:

12. Mr. Peiffer objected to Mr. Sainsbury's changing of his time card on several occasions, one of which resulted in a physical altercation between him and Mr. Sainsbury.

13. On several occasions, Mr. Peiffer also objected to Mr. Silvers regarding the changing of his time card.

14. Ultimately, Mr. Peiffer quit on June 8, 2012 after Mr. Sainsbury had again altered his time card. Mr. Peiffer refused to return to work until Pro-Cut paid him the full wages owed to him for the time period.

CP at 124. Based on its findings, the trial court concluded that Pro-Cut willfully withheld Mr. Peiffer's unpaid wages. But it also concluded that Mr. Peiffer knowingly submitted to the withholding of his wages.

Mr. Peiffer contends the trial court's conclusion that he knowingly submitted to Pro-Cut's violations is not supported by its findings. We review de novo whether a court's findings of fact support its conclusions of law. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016).

Two decisions of this court establish that to "knowingly submit" to the unlawful withholding of wages, "the employee[ ] must have deliberately and intentionally deferred to [the employer] the decision of whether they would ever be paid." *Chelius v. Questar Microsystems, Inc.*, 107 Wn. App. 678, 682, 27 P.3d 681 (2001), *accord Durand v. HIMC Corp.*, 151 Wn. App. 818, 836-37, 214 P.3d 189 (2009). In both *Chelius* and

*Durand*, the employee had agreed to a deferral of wages but the courts found the employees to have agreed to only temporary deferral; neither employee agreed to no payment at all. Pro-Cut persuaded the trial court that this case is different because Mr. Peiffer never agreed to any deferral—he complained pointedly enough to be told that if he didn't like what was happening, he could quit.

This is a valid distinction between the facts of case and those presented in *Chelius* and *Durand*, but one that makes it *clearer* that Mr. Peiffer did not knowingly submit to the withholding of his wages. One "submits" when one "bow[s] to the will or authority of another **:** YIELD[S]" or "become[s] resigned **:** acquiesce[s] uncritically." WEBSTER'S *supra*, at 2277. As a matter of law, the trial court's unchallenged findings that Mr. Peiffer made clear and continuing objections to the withholding support the conclusion, and only the conclusion, that he did not knowingly submit to the withholding. On remand, the trial court is directed to award Mr. Peiffer double damages.

VI.    THE AWARD OF ATTORNEY FEES AND COSTS IS INADEQUATELY EXPLAINED AND MUST BE REMANDED FOR RECONSIDERATION AND THE ENTRY OF FINDINGS

"[T]he trial court must provide sufficient information concerning its fee determination to enable meaningful appellate review." *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 54 Wn. App. 180, 186, 773 P.2d 114 (1989) (*PAWS* ), *rev'd on other grounds*, 114 Wn.2d 677, 790 P.2d 604 (1990). "[T]he absence of an adequate record upon which to review a fee award will result in a remand of the award to the trial

court to develop such a record." *Mahler v. Szucs*, 135 Wn.2d 398, 435, 957 P.2d 632 (1998). Specifically, "[a]n award of substantially less than the amount requested should indicate at least approximately how the court arrived at the final numbers, and explain why discounts were applied." *Absher Constr. Co. v. Kent Sch. Dist. No. 415*, 79 Wn. App. 841, 848, 917 P.2d 1086 (1995).

The trial court was presented with a lodestar calculation of $73,395.50 in attorney fees incurred for the services of Ms. Berry and Mr. Davis. Washington courts apply the lodestar method to determine the starting point for reasonable attorney fees. *McGreevy v. Oregon Mut. Ins. Co.*, 90 Wn. App. 283, 291, 951 P.2d 798 (1998). "'The lodestar award is arrived at by multiplying a reasonable hourly rate by the number of hours reasonably expended on the matter.'" *Id*. (emphasis omitted) (quoting *Scott Fetzer Co. v. Weeks*, 122 Wn.2d 141, 149-50, 859 P.2d 1210 (1993)). The trial court evaluates whether to adjust that amount up or down, *id.*, but it must be a reasoned evaluation. Since "[t]he court must limit the lodestar to hours reasonably expended, [it] should therefore discount hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time." *Bowers v. Transamerica Title Ins. Co*., 100 Wn.2d 581, 597, 675 P.2d 193 (1983).

When a trial court awards significantly less attorney fees than requested, "it should at least indicate what part of the lawyer's work the court discounted as unnecessary or unreasonable, how much of the lawyer's hourly fee the court found excessive, or the

32

manner by which the court reduced." *PAWS*, 54 Wn. App. at 187.  This generally does

not mean the trial court must include an "explicit hour-by-hour analysis of each lawyer's

time sheets." *Id.*

The trial court's reduction of the lodestar figure without explanation other than

that it found $50,000 to be a reasonable amount requires remand.  We recognize that the

judge who presided at trial has retired, and if he is unavailable to reconsider and enter

findings in support of a new award,[10] the task of reviewing the record and making the

award will fall to another judge.  Any new judge should consider the trial court's relevant

findings, including the trial court's finding that the facts presented at trial were relevant

to all the claims asserted in the matter.

Mr. Peiffer asks that as part of our remand of the attorney fee award, we direct the

trial court to apply a multiplier of 1.5.  Br. of Resp't/Cross Appellant at 50.  That we will

not do.  "In Washington, adjustments to the lodestar product are reserved for 'rare'

occasions." *Berryman v. Metcalf*, 177 Wn. App. 644, 665, 312 P.3d 745 (2013) (quoting

*Sanders v. State*, 169 Wn.2d 827, 869, 240 P.3d 120 (2010)).

> [O]ccasionally a trial court will be justified in making an upward
> adjustment to account for risk, particularly in cases brought to enforce
> important public policies that government agencies lack the time, money, or
> ability to pursue.  Presumptively, however, the lodestar represents a

---

[10] *See* RCW 2.08.180.  To serve as a judge pro tempore, a retired judge must have
retained his or her membership in the bar.  *See id.*

reasonable fee. A party who seeks an upward adjustment bears the burden of proving it is warranted by arguments rooted in the record.

*Id.* at 678.

Because the refusal to apply a multiplier is unexplained, preventing us from reviewing for any abuse of discretion, Mr. Peiffer may renew his argument for a multiplier on remand. He is entitled to argue from the trial court's findings 27, 28, and 29.

Finally, the trial court failed to explain why it refused to award all the costs requested by Mr. Peiffer. That, too, is remanded for reconsideration and the entry of findings. While the trial court was not required to award travel expenses, they are a cost that can be allowed by the court in a wage case. *McConnell v. Mothers Work, Inc.*, 131 Wn. App. 525, 531-32, 128 P.3d 128 (2006) (RCW 49.46.090 authorizes expanded costs "as may be allowed by the court.").

<u>Fees on Appeal</u>

Mr. Peiffer requests an award of reasonable attorney fees on appeal. RAP 18.1 permits recovery of reasonable attorney fees or expenses on review if applicable law grants that right. Mr. Peiffer relies on RCW 49.46.090, RCW 49.48.030, and RCW 49.52.070 for his request. RCW 49.46.090 provides that an employer who pays an employee less than wages entitled to shall be liable to the employee for full amount of wage rate, costs, and attorney fees. RCW 49.48.030 provides for reasonable attorney fees

when a person successfully recovers wages owed to him or her.  Additionally, RCW 49.52.070 provides civil liability for double damages in wage withholding cases along with reasonable attorney fees and costs.

Mr. Peiffer has prevailed on appeal on every issue other than (1) Pro-Cut's challenge to the amount awarded to offset his increased tax liability and (2) his request that we direct the trial court to apply a multiplier to his fee award.  We award him reasonable attorney fees and costs on appeal subject to his compliance with RAP 18.1(d).

We affirm the trial court's rulings that the statute of limitations for Charles Peiffer's wage claim was tolled during the period his wage complaint was under investigation by the Department of Labor and Industries and that Mr. Peiffer was entitled to an award of his reasonable attorney fees and costs.

We reverse the trial court's dismissal of Mr. Peiffer's claim for constructive wrongful termination in violation of public policy, reverse its award of an amount to compensate Mr. Peiffer for an increased tax liability, reverse its finding that Mr. Peiffer knowingly submitted to withholding of his wages, and reverse and remand the inadequately-explained attorney fee and cost award.

We remand for a new trial on the constructive wrongful termination claim, for reconsideration of the award of reasonable attorney fees and costs and the entry of sufficient findings, and with directions to enter a supplemental judgment that will afford

No. 34715-0-III
*Peiffer v. Pro-Cut Concrete, et al.*

Mr. Peiffer double damages for his wage claim less the $8,784 tax-related amount that was awarded in error.

_____
Siddoway, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Korsmo, J.